**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIM. NO. 13-137 (KBJ)** |
| | : | |
| **v.** | : | |
| | : | |
| **CHARLES NICKERSON, JR.,** | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following memorandum to assist the Court in issuing an appropriate sentence in this case. For the reasons set forth herein, the government recommends that the Court accept the proposed plea agreement pursuant to Rule 11(c)(1)(C) and sentence the defendant to 120 months (ten years) of incarceration. The government further recommends that the Court sentence the defendant to 120 months of supervised release, with the conditions recommended by United States Office of Probation, including that the defendant undergo intensive sex offender treatment, the defendant's computer and internet usage be limited and monitored, and the defendant's direct contact with minors be limited and supervised. The defendant is required by statute to register as a sex offender for a minimum period of 25 years.

## I.    BACKGROUND

On June 5, 2013, the defendant pled guilty to one count of Travel with Intent to Engage in Illicit Sexual Conduct, and one count of Distribution of Child Pornography. During the plea hearing, the defendant admitted the following facts, as set forth in the written Statement of Offense, to be true.

Leading up to March 5, 2012, Metropolitan Police Department Detective Timothy Palchak was acting in an undercover capacity as part of a multi-jurisdictional FBI/MPD Child

Exploitation Task Force, operating out of a satellite office in Washington, D.C.  In that capacity, Detective Palchak ("UC") previously registered as a member and created an online profile on a predicated social network website which, based on the UC's experience and information gathered from other sources, is a site frequented by individuals that have a sexual interest in children.

On March 5, 2012, at approximately 11:46 a.m., the UC sent a message in the public area of the "incest" chat room on the predicated social network website inquiring, "Any other no limit pervs" in the Washington, D.C. metropolitan area.[1]  At 11:47 a.m., an individual using the screen name "chuck_2131" initiated a private instant message chat with the UC through the predicated social network website.  During the early portion of the instant message chat, "chuck_2131" – who was later identified as the defendant, Charles Augustus Nickerson, Jr. – identified himself as a 33-year-old male from Maryland, specifically an area near Baltimore.  In response to the UC's noted interest in "yng" and "incest", the defendant noted that he was interested in the "same" and asked, "[H]ave you had incest b4[?]"

As the online exchange continued, the UC posed as an individual that had sexual access to his 12-year-old daughter.  When the UC inquired if he had "any exp[erience]," the defendant responded, "[Y]es . . . [with] friend daughter."  The defendant also inquired whether the UC would "share" his daughter and asked specifically about the girl, "[S]he have hair yet[?]"  When the UC offered to provide the defendant with a photo of the purported child, the defendant responded affirmatively, after which the defendant and the UC shifted their online conversation to Yahoo! Instant Messenger, a platform in which the defendant used the screen-name "Chuck

---

[1]     The entire chat between the UC and the defendant on the social networking site is attached as Exhibit 1.

Nickerson" and Yahoo user account "chuck_2131".[2]  The UC subsequently sent the defendant a morphed, clothed picture of the purported child, to which the defendant responded, "Very cute . . . would I need a condoms[?]"

As the online conversation continued, the defendant provided further details regarding the 11-year-old daughter of his friend with whom he has been sexually active.  Specifically, the defendant noted that he still engages her in sexual acts and that his friend does not know about it. He stated further that it has been a "month or so" since he last engaged her in sexual acts, and noted that he "fill[ed] her full of cum" at the child's house while her parents "are out drinking." He explained that, "as soon as they go she just gets naked."

During the course of the online chat on March 5, 2012, the defendant sent the UC five images of child pornography.  The first image, titled "0001 (1214)", depicted a prepubescent girl being vaginally penetrated by an adult male penis.  The second image, titled "-00a(3)", depicted a prepubescent girl spreading her bare vagina with what appeared to be semen covering her bare vagina.  The third image, titled "untitled.bmp", depicted a bare vagina with a hand covering her face (age unknown).  The fourth image, titled "localone_mommyfun2131_ 1316635965", depicted a young girl 12-15 lying naked with her legs slightly spread exposing her vagina.  The fifth image, titled "LetsHavingFun69_mommyfun2131_1330438276", depicted a prepubescent girl holding an erect penis with her hand with her mouth close to the penis.

During the March 5 online chat, the UC and the defendant also discussed the possibility of meeting on Friday, March 9, 2012, for purposes of engaging in sexual acts with the UC's purported 12-year-old daughter.  The defendant asked, "[W]ill you tell her about me[?] . . . [W]ill you get me a few more pics of her . . . with a lil less on[?]"  As their initial online chat

---

[2]     The entire chat between the UC and the defendant on Yahoo! Instant Messenger is attached at Exhibit 2.

drew to a close at approximately 1:25 p.m. on March 5, 2012, the defendant told the UC to "fin[
]d out when her next period will be."

The UC and the defendant resumed their online exchange at approximately 8:11 p.m. on
March 5, 2012.  After learning that the UC had been to see his daughter following their initial
interaction earlier that day, the defendant inquired, "[D]id you find when her period is[?]"  When
the UC noted that he would find out, the defendant asked, "[D]o you want me to pull out . . . I
would love to put 4 or 5 loading in her . . . I hope you let me."  The defendant also inquired,
"[W]hat will you let her wear . . . a dress or skirt . . . she wear a bra yet[?]"  The defendant then
instructed the UC to have the child "wear a tight shirt no bra . . . and a short skirt . . . maybe no
panties."  In discussing the planned threesome with the purported child, the defendant asked,
"[D]o you want to [double- penetrate] her[?]"  The defendant also asked, "[I]s she a dirty lil girl .
. . are you training her to be a lil whore[?]"  In the course of the online exchange, the defendant
also noted that he had KY lubricant to bring with him, as well as a camera.[3]  The defendant also
asked if the UC would have the purported child "all weekend long" so that they could "use her
all night."  The defendant also inquired if the UC would allow the purported girl to become
pregnant "when she gets a few years older," and added "maybe at 14 . . . it would be more hott
now . . . and make her have it."  The defendant also asked, "[A]re you training her to be a slave .
. . that's how girls should be."  With respect to their planned meeting with the girl, the defendant

---

[3]     During the chat, the UC first raised the possibility of filming the sexual activity,
asked if the defendant had a camera, and asked what kind of camera he had.  The defendant said
that he was interested in filming them, said that he had a camera, asked if the UC wanted pictures
taken, asked if the UC's daughter was okay with having her picture taken, and described the
sexually explicit pictures that he (the defendant) wanted to take of the UC's daughter.  The UC
brought up the camera again toward the end of the chat, telling the defendant that he wanted to
put the pictures on his computer before the defendant left.

also noted, "[W]e can fuck her for hours . . . you want to make her loo[se] . . . you want to dp [(double-penetrate) her pussy[?]"

During the course of the March 5, 2012, online exchange, the defendant also transmitted a photograph of himself to the UC.

On Tuesday, March 6, 2012, the defendant and the UC engaged in an additional instant message conversation online.  Towards the beginning of the online exchange, the defendant asked, "[W]ill you see your daughter this week[?]"  When told by the UC that the purported child "will be here Fri[day]," the defendant replied, "[I]s she ready[?]"  As the online conversation continued, the defendant asked for additional details relating to the child – inquiring, "[D]o you call her a whore . . . I like her to be a big whore . . . have her go in her[e] and dress like a whore."  With respect to the planned meeting, the defendant asked, "[W]ill you have to tell her to do stuff" and also whether the child is "ok with getting her pic taken."  In discussing the taking of pictures during the planned meeting, the defendant noted that he had a "nice camer[a]" to bring with him.  The defendant noted that, in taking the pictures, he would "start when her being a good girl . . . then make her sit with her legs open . . . then make her get naked . . . make her finger her pussy."  The defendant also asked, "[D]o you use toys on her yet[?]", and noted further, "[I] have a pussy pump and a pump dildo . . . you want to pump the dildo in her to open her wide . . . then we can dp [(double-penetrate) her pussy."  The defendant also noted, "[I] want to take pic of her cunt with my cum running out of her . . . make her a bareback whore . . . tell her if any one wants to fuck her it has to be bareback" – which is a reference to engaging in unprotected sex.  The defendant also noted his desire to "fill her full of my seed . . . and watch her tummy grow."

During the March 6 chat, the UC specifically asked the defendant whether he was "serious about coming or are you just into the fantasy just want to know . . . im into realtime . . . I know some guys just like fantasy so just checking . . . no worries either way" – to which the defendant responded, "[Y]es I want real time."  Immediately following that exchange, the defendant noted, "[I] can pull out if you want me too . . . or a condom," and then stated further, "[I]t would be hot if she did get preg[nant]."  The defendant and the UC thereafter discussed logistics relating to the planned meeting and the possibility of taking the purported child out for dinner.  The defendant asked the UC, "[W]ill you let her go out looking like a lil whore . . . short skirt tight top pig tales and no bra or panties[?]"  The defendant also asked the UC, "[D]oes she do as she[']s told[?]"  The defendant also stated, "[O]ne day I may have a lil girl . . .maybe we start her sooner."  He added, "[M]aybe in a few years your daughter will have a daughter . . . can I get her preg[nant] then . . . maybe I can marry her on her 18th b-day."

On Wednesday, March 7, 2012, the defendant and the UC resumed their online exchange, during which the defendant noted his continued interest in meeting on Friday, March 9, 2012.  The defendant asked, "[D]oes she suck cock good . . . she swallow[?]"  The defendant also noted that he was "just a lil scared."  The defendant also asked various questions about the purported child, inquiring specifically, "[H]ow many finger[s] can you get in her ass . . .you should start trying to work mo[r]e in . . . lo[v]e to dp her."  The defendant also asked, "[W]hat her pussy look like . . .not many hairs[?]"

During the March 7 chat, the defendant also noted that he has a 4-year-old son for whom he has shared-custody every other weekend.  The defendant described a "few times" that he has bathed with his son, during which he "just wash[ed] him a lil longer down there" and also had his son wash his penis until the defendant became erect.  The defendant and the UC thereafter

discussed having the defendant's son and the UC's purported daughter engage in sexual acts in the future, with the defendant noting that they would "have her suck him" and expressing that he would "love to see him try to fuck her."

With respect to the planned meeting with the purported 12-year-old girl on March 9, 2012, the UC again provided the defendant an opportunity to opt-out – telling him, "[A]gain if you don't want to meet I understand just let me know so im not waiting for you and you don't show up . . . that would be a dick move, I still want to be your friend even if you don't want to join in" – to which the defendant responded, "[I] want to join in but very scared . . . I want to so bad . . . I wish we could do it at my house."  The defendant and the UC also discussed the possibility of meeting at a hotel, but the defendant noted, "[H]otel may not be good . . . 2 guys take a lil girl in a room . . .they have cam there . . . and one of are name would be on the check in."  When asked if he was nervous that the UC was "not real," the defendant replied, "[O]r your a cop."  The defendant also stated, "I don't want to come over and it a trap."  When told that they could wait longer or "just not even do it at all," the defendant responded, "[I] want to do it." Towards the end of the March 7 exchange, the defendant noted his desire to "[L]ets try fri[day]," and noted further, "[I] hope this wont be just once."

On Thursday, March 8, 2012, the defendant and the UC resumed their online conversation.  The defendant asked, "[Y]ou ready for tomorrow[?]" and noted that he was "scared shitless."  The defendant and the UC further agreed to meet beforehand to validate that neither was affiliated with law enforcement.  In discussing the planned meeting with the purported girl, the defendant asked, "[W]ill she be shy . . . she like to kiss[?]"  The defendant also noted, "[I] like if you told her to get in her sully lil skirt . . . then have he[r] come sit on my lap an[d] tell me she a dirty lil whore . . . and start kissing me . . . I want her to make the moves .

. . how dirty you want to make her[?]"  The defendant also explained that he would bring a "pussy pump to make her lips get bigger" and to "open up her cunt."

On Friday, March 9, 2012, the defendant and the UC engaged in additional online exchanges relating to their planned meeting with the purported 12-year-old girl.  The defendant indicated that he wanted the child to "ask me if im going to cum in her . . . then ill ask her [if] she wants me too . . . after she say yes . . . I want her to ask me if im fixed like daddy."  The defendant also explained that the "pump cock" he would be bringing "will open her up."  The defendant also inquired if he "should shave" before their meeting, and explained to the UC that he would just "trim" his pubic area.

During the course of the March 9 chat, the defendant indicated that he would get his GPS device and put it in his truck.  At one point, law enforcement agents conducting surveillance of the defendant's home in Stevensville, Maryland observed the defendant exit his house and go to his vehicle, after which the defendant returned inside.  In his chat with the UC, the defendant again reiterated that he was "scared" to meet and noted, "I don't want to go to jail e[i]ther . . . ive never done this b4."  The defendant asked to see a pornographic picture of the purported child, to which the UC responded, "I am really looking for real time not into pic sharing . . . if you feel uncomfortable about coming I totally understand" – to which the defendant replied, "[J]ust scared."  The defendant also noted his desire "to have a ltr [(long term relationship)] with you two . . . this could be a great thing."  The defendant also asked, "[C]an we all meet at the same time[?]"  When the UC indicated that the defendant could stand in front of his building to see the purported child being dropped off, the defendant stated, "[Y]eah ill take the risk."

At approximately 5:32 p.m. on March 9, 2012, the defendant asked the UC to provide his address and noted that he would be leaving in 5 minutes, after getting gas.  The defendant noted

that he would arrive in approximately 50 minutes and asked for the UC's telephone number.  The defendant also asked if the purported girl had arrived already, to which the UC responded that she would be there around 7:00 or 7:30 p.m.  At approximately, 5:45 p.m., the defendant sent an online message stating, "Leaven now."

At approximately 7:00 p.m. on March 9, 2012, the defendant was observed traveling northbound in the 700 block of 5th Street, NW, Washington, DC in a blue 2006 Chevrolet Silverado, bearing Maryland registration number A153857, and VIN 1GCHK29D56E154990.  The defendant was stopped in his vehicle at 6th and Massachusetts Ave, NW, Washington, D.C. and placed under arrest without incident.  The defendant produced a Maryland Driver's License bearing the name "Charles Nickerson, Jr."  A subsequent inventory search of the defendant's blue 2006 Chevrolet Silverado revealed the presence of two child car-seats – one appearing related to a girl and the other a boy – and a blue bag containing KY lubricant, a "FinePix" digital camera, a GPS device and various forms of sexual paraphernalia in its original packaging, including a "pussy pump", a "prostate probe" and two vibrating dildos.  Law enforcement impounded the defendant's blue 2006 Chevrolet Silverado incident to his arrest.

During the course of the online chat between the defendant and the UC on March 5, 2012, the UC captured the IP address being utilized by the defendant.  Follow-up investigation relating to that IP address indicated that it resolved back to Verizon Internet Services out of Hurlock, Maryland.  Through additional follow-up investigation, including the use of law enforcement and public database searches, based on the information obtained during the online chats, law enforcement identified the defendant and obtained a copy of his DMV identification photograph.  The person depicted in the DMV photograph matched the person depicted in the photograph that the defendant transmitted to the UC during the course of the online chat.

On March 12, 2012, a search warrant was applied for and issued by a judicial officer for the defendant's residence in Stevensville, Maryland.  The warrant was executed on the same day. One of the items seized was a Dell Inspiron computer, Model 560, serial number 8JSVLN1. That computer was subsequently forensically analyzed, and numerous images of child pornography were found on it, including the five images distributed to the undercover officer described above, as well as at least four additional images of child pornography and three additional images of child erotica.[4]

## II.   SENTENCING CALCULATION

### A.   Statutory Penalties

Travel with Intent to Engage in Illicit Sexual Conduct is a charge that carries a maximum sentence of 30 years of imprisonment pursuant to 18 U.S.C. § 2423(b), a fine of not more than $250,000 or twice the pecuniary gain or loss pursuant to 18 U.S.C. § 3571, and a period of supervised release – after any period of incarceration – of not less than five years or life pursuant to 18 U.S.C. § 3583(k).

Distribution of Child Pornography is a charge that carries a maximum sentence of 20 years of imprisonment, with a mandatory minimum of 5 years imprisonment pursuant to 18 U.S.C. § 2252A(b)(1), a fine of not more than $250,000 or twice the pecuniary gain or loss pursuant to 18 U.S.C. § 3571(d), an order of restitution, and an obligation to pay any applicable interest or penalties on fines or restitution not timely made, and a period of supervised release – after any period of incarceration – of not less than 5 years or life pursuant to 18 U.S.C. § 3583(k).

---

[4]     The government will make these images available for the Court to view in preparation for sentencing at the Court's convenience.

In addition, there is a mandatory special assessment for each felony conviction pursuant to 18 U.S.C. § 3013(a)(2)(A).

Pursuant to 42 U.S.C. § 16911(3)(B), the defendant will be considered a Tier II sex offender for purposes of the Sex Offender Registration and Notification Act "SORNA." Pursuant to 42 U.S.C. § 16015(a)(2), as a Tier II sex offender, the defendant will be required to register as a sex offender for 25 years.  The defendant will also be subject to local and state registration requirements.

### B.    Guidelines Range

The government largely agrees with the calculation of the defendant's Guidelines range set forth in the draft Presentence Investigation Report ("PSR").  The final PSR had not been issued at the time of filing this memorandum.

For the charge of Travel with Intent to Engage in Illicit Sexual Conduct, the base offense level pursuant to U.S.S.G. § 2G1.3(a)(4) is 24.  PSR ¶ 45.  A two-level increase applies for use of a computer pursuant to § 2G1.3(b)(3), resulting in an adjusted offense level of 26.  PSR ¶ 45. The government agrees that the cross-reference under § 2G1.3(c)(1) applies because the offense involved causing a minor to be engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct.  PSR ¶ 45.  The base offense level is thus 32 pursuant to § 2G2.1(a).  PSR ¶ 45.  The offense involved a minor between the ages of 12 and 16, resulting in a two-level increase pursuant to § 2G2.1(b)(1)(B).  PSR ¶ 46.  The offense involved use of a computer to persuade, induce, entice, coerce, or solicit a minor to engage in prohibited sexual conduct, resulting in a two-level increase pursuant to § 2G2.1(b)(6)(B).  PSR ¶ 47.  There are no additional adjustments, resulting in an adjusted offense level of 36.  PSR ¶ 51.

For the charge of Distribution of Child Pornography, the base offense level is 22 pursuant to U.S.S.G. § 2G2.2(a)(2).  PSR ¶ 52.  The offense involved material depicting a prepubescent

minor, adding two levels pursuant to § 2G2.2(b)(2).  PSR ¶ 53.  The offense involved material portraying sadistic or masochistic conduct, adding four levels pursuant to § 2G2.2(b)(4).  PSR ¶ 54.  The offense involved use of a computer, adding two levels pursuant to § 2G2.2(b)(6).  PSR ¶ 55.  The draft PSR assigns an additional two levels pursuant to § 2G2.2(b)(7)(A) on the grounds that the offense involved 10 to 150 images.  PSR ¶ 56.  As set forth in the government's objections to the PSR filed on August 13, 2013, the government believes that this enhancement does not apply because the defendant possessed only nine images depicting child pornography.  The three additional images of child erotica should not be included in the image count.  Accordingly, the government believes that the defendant's adjusted offense level for this count is 30, rather than 32.

This corrected adjusted offense level for Count Two changes the multiple count adjustment and total offense level.  Pursuant to U.S.S.G. § 3D1.4, Count 1 (adjusted offense level of 36) is assigned 1 unit and Count 2 (adjusted offense level of 30) is assigned ½ unit because it is 5 to 8 levels less serious than the offense with the highest offense level.  With 1 ½ units, one level is added to the highest offense level (36) for a combined adjusted offense level of 37.

The defendant is entitled to a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a).  The government hereby moves to decrease the defendant's offense level by an additional level pursuant to § 3E1.1(b) because he timely notified the authorities of his intention to enter a guilty plea and thus permitted the government and the Court to preserve resources.  As a result, the defendant's total offense level is 34.

The defendant has no criminal convictions that result in any criminal history points. Accordingly, the defendant has a criminal history score of zero and is in criminal history category I.

With a total offense level of 34 and a criminal history category of I, the defendant's sentencing range is 151 to 188 months of incarceration.

## III.   GOVERNMENT'S RECOMMENDATION

### A.   Application of the Federal Sentencing Guidelines

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1). Booker, 125 S. Ct. at 756.

In post-Booker cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. See United States v. Gall, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). Id. These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing

Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

On February 27, 2013, the Sentencing Commission released a report concerning the Guidelines for child pornography offenses ("The CP Report").  The CP Report contained numerous observations that are relevant to a sentencing judge.  The CP Report recognized that child pornography offenses inherently involve the sexual abuse and exploitation of children, that child pornography victims are specifically harmed by the distribution of their images over the Internet, and that many victims suffer lifelong harm at know that their images are being used by offenders for sexual gratification.  The CP Report emphasized the growing problem of online child pornography communities that facilitate and validate child sexual exploitation.  The CP Report also identified many problems with the non-production child pornography Guidelines and included recommendations about how to change the Guidelines to better account for offender behavior, including through the elimination of some specific offense characteristics and the revision and addition of other enhancements.

Although the Commission has asked Congress for permission to revise the child pornography Guidelines, no changes have been made at this time.  The CP Report provided a framework of factors to consider under the statute.  These factors should be considered in conjunction with – not instead of – the existing Guidelines.  Unless and until Congress permits and the Commission makes changes to the Guidelines, a sentencing court should determine a defendant's Guidelines range based on the current Guidelines.

### B.    Basis for the Government's Recommendation

The government submits that the agreed-upon sentence of 120 months of incarceration is appropriate and warranted in this case based on the factors in 18 U.S.C. § 3553(a).  In addition,

the government recommends 120 months of supervised release, with the specific conditions of supervision recommended by the United States Office of Probation.  The recommended sentence is sufficient, but not greater than necessary, to accomplish the purposes of sentencing.

### 1.     The Nature and Circumstances of the Offense

The offenses in this case are undeniably egregious.  The defendant wanted to have sex with a 12 year-old girl and traveled from Maryland to D.C. for the purpose of doing so, bringing with him multiple items of sexual paraphernalia and a camera.  The defendant's own words paint a horrifying picture of what he planned to do to the child, including using sexual toys and taking photographs.  The defendant executed the plan as far as he was able; however, the defendant did not know that the child was the fictional creation of the individual he communicated with online, who was actually an undercover detective.  When the defendant arrived in D.C., the defendant believed the child was real and believed that he would be able to sexually abuse her that day.  He expressed a desire to do so on later occasions as well.  The defendant's criminal actions are deserving of severe punishment.

The defendant's distribution of child pornography is similarly serious.  During the course of their online communications, the defendant sent five images depicting child pornography to the undercover detective.  These images included a prepubescent female being vaginally penetrated by an adult male penis, multiple depictions of the vaginas of prepubescent females, and a prepubescent female holding an erect penis close to her mouth.  Child pornography is not just about images and videos, it is about children.  It is about children who are at best being treated as sexualized objects and at worst being horrifically and repeatedly abused.  The abuse of child pornography victims does not end, however, when the physical contact or production of images or videos is over.  The abuse and harm go on as long as those images and videos are viewed, traded, collected, and used by offenders for sexual gratification.  This harm cannot be

overstated.  Particularly in the Internet age, victims of child pornography must attempt to cope

with the knowledge that worst moments of their young lives are forever memorialized and

available to child pornography consumers.  Individuals – like the defendant – who receive, seek,

view, keep, and use child pornography for their own sexual gratification maintain the illicit

market for child pornography, which continually re-victimizes the children in already-existing

images and videos and promotes the brutalization of even more children for new images and

videos.

Courts have long recognized the harms posed by child pornography offenders.  As the

Supreme Court recognized in the seminal case of New York v. Ferber:

> The use of children as subjects of pornographic materials is very harmful to both
> the children and the society as a whole.  It has been found that sexually exploited
> children are unable to develop healthy relationships in later life, have sexual
> dysfunctions, and have a tendency to become sexual abusers as adults.
>
> Pornography poses an even greater threat to the child victim than does sexual
> abuse or prostitution.  Because the child's actions are reduced to a recording, the
> pornography may haunt him in future years, long after the original misdeed took
> place.

458 U.S. 747, 758-60 nn. 9 & 10.  The Court continued, "[a] child who has posed for a camera

must go through life knowing that the recording is circulating within the mass distribution

system for child pornography. . . . It is the fear of exposure and the tension of keeping the act

secret that seem to have the most profound emotion repercussions."  Id. at 759 n.10.[5]  The

---

[5]     As the Fifth Circuit similarly concluded, the crimes of a "'passive' child
pornography recipient" are not "somehow attenuated as compared to a person who actually
produces or distributes child pornography . . . victimization of a child depicted in pornographic
material flows just as directly from the crime of knowingly receiving child pornography as it
does from the arguably more culpable offenses of producing or distributing child pornography."
United States v. Norris, 159 F.3d 926, 930 (5th Cir. 1998).  After all, "the 'victimization' of the
children involved does not end when the pornographer's camera is put away.  The consumer, or
end recipient, of pornographic materials may be considered to be causing the children depicted in
those materials to suffer as a result of his actions."  Id. at 929.

defendant's distribution of child pornography is very harmful and should be punished accordingly.

### 2.        History and Characteristics of the Defendant

The defendant has no prior criminal convictions.  The defendant is a high school graduate, although he reportedly had difficulty in school and was in special education classes. The defendant was employed prior to his arrest and has familial support.  The defendant reported to the PSR writer that he was sexually abused by an adult family friend when he was approximately 12 or 13 years old.  The defendant never told anyone about the abuse until this case arose.  (However, sometime after allegedly abusing the defendant, the abuser was convicted for sexually abusing other minors.)

The most troubling aspect of the defendant's history and characteristics is that he is a father of a young boy.  During the online chats, the defendant talked about spending time with his child in the bath, including washing his son's penis and having his son wash his penis until the defendant became erect.  A subsequent forensic interview of the defendant's then 4 year-old son corroborated that, at a minimum, the defendant had bathed with his son.[6]

The defendant's history and characteristics provide some grounds for mitigation but ultimately suggest that he should be held strictly accountable for his perverse and illegal behavior.

### 3.        Punishment, Deterrence, Protection, and Correction

A sentencing court "shall impose a sentenced sufficient, but not greater than necessary" to comply with the need for a sentence: "(A) to reflect the seriousness of the offense, to promote

---

[6]        The defendant was facing potential criminal charges in the State of Maryland for his conduct with regard to his son.  Those charges have been resolved by the plea agreement in this case, as specifically detailed in the Plea Agreement and Statement of Offense.

respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2).

The government's recommended sentence of 120 months is sufficient, but not greater than necessary, to provide just punishment for the defendant's offenses.  The defendant's effort to have sex with a child and his distribution of child pornography are crimes that harm society and specific child victims and warrant a significant sentence of imprisonment.  A less substantial sentence would not provide requisite deterrence for the defendant or other offenders and thus would not adequately protect the public.  The defendant will be able to receive sex offender treatment and any other treatment that may become necessary while he is incarcerated.

### 4.    Available Sentences

The defendant should be sentenced to a term of incarceration.  The defendant is not eligible for a probationary sentence under the Guidelines, and both parties have agreed that 120 months is an appropriate sentence.

In addition, the Court should impose a term of supervised release, and the government recommends a term of 120 months (10 years).  A lengthy term of supervised release is critical because it will subject the defendant to ongoing monitoring and sex offender treatment.  The conditions of supervised release should include:  sex offender evaluation and treatment, restrictions on direct contact with minors, and restrictions on the defendant's use of the Internet, computers, and any other Internet-capable devices.  The defendant's crimes stem from his online communications:  the defendant distributed child pornography online and exchanged online messages to arrange to meet and have sex with a 12 year-old girl.  The defendant's use of the Internet to commit his crimes justifies restricting his future use.  Likewise, the defendant's effort

to have sex with a child and his possession of child pornography justify limiting his direct contact with any minors and support the imposition of sex offender evaluation and treatment. The Court should impose all of the special conditions recommended by the United States Office of Probation in the PSR and at sentencing.

### 5.   Avoiding Unwarranted Sentencing Disparity

The government believes that a sentence of 120 months of incarceration is appropriate in this case and would not result in unwarranted sentencing disparity.  The recommended sentence is fair when compared to the sentences of other defendants who engaged in similar conduct.

In <u>United States v. Swain</u>, Case No. 12-CR-186 (JEB), Swain pled guilty to one count of Distribution of Child Pornography and one count of Possession of Child Pornography, and was sentenced to concurrent 96-month terms of imprisonment, with 120 months of supervised release.  Like the defendant, Swain distributed child pornography to an undercover detective and discussed meeting with the detective to have sex with the detective's purported child.  However, unlike the defendant, Swain did not appear for any such meeting.  Swain's plea, like the defendant's plea, resolved potential charges in other jurisdictions.

In <u>United States v. Calhoun</u>, Case No. 12-CR-218 (JDB), Calhoun pled guilty to one count of Distribution of Child Pornography and was sentenced to 100 months of imprisonment and 120 months of supervised release.  Like the defendant, Calhoun sent child pornography to an undercover detective.  Calhoun traveled from Maryland to D.C., but only for the purpose of surreptitiously taking pictures of young girls in public and not with the intent to have sex with a child.

In <u>United States v. Zagorski</u>, Case No. 11-CR-351 (RBW), Zagorski pled guilty to one count of Distribution of Child Pornography and was sentenced to 99 months of incarceration and 120 months of supervised release.  Like the defendant, Zagorski distributed child pornography to

an undercover detective.  Zagorski also faced a similar cross-reference in his sentencing range

calculation because he intended to engage in a live webcam with the undercover detective's

purported 12 year-old daughter.  Zagorski's Guidelines' range exceeded the statutory maximum

penalty.

In United Sates v. Burdette, Case No. 11-CR-277 (RMC), Burdette pled guilty to

Distribution of Child Pornography pursuant to a plea agreement under Rule 11(c)(1)(C) with an

agreed upon range of 120 to 168 months.  Burdette was sentenced to 144 months of incarceration

and 120 months of supervised release.  In addition to evidence of distribution of child

pornography, there was evidence that Burdette intended to engage in a live webcam with the

UC's purported 12 year-old daughter.  Burdette's exposure in other jurisdictions was not

resolved by his plea.

In United States v. Rock, Case No. 11-CR-376 (RMC), Rock pled guilty to Distribution

of Child Pornography pursuant to a plea agreement under Rule 11(c)(1)(C) with an agreed upon

range of 144 to 180 months.  Rock was sentenced to 172 months of incarceration and 120

months of supervised release.  Rock actually produced child pornography by surreptitiously

filming his girlfriend's daughter and sent the child pornography to an undercover detective.

Rock's plea agreement resolved his related criminal liability in Pennsylvania.

In United States v. Robinson, Case No. 11-CR-257 (GK), Robinson plead guilty to

Distribution of Child Pornography pursuant to a plea agreement under Rule 11(c)(1)(C) with an

agreed upon range of 96 to 120 months.  Robinson was sentenced to 114 months.  Robinson had

sent child pornography to an undercover detective and had tried to arrange a live webcam session

with the undercover detective's purported 12 year-old daughter.

Although none of these cases involve the exact same facts or charges as in the instant case, the government believes these cases are comparable to the defendant's case and provide an appropriate context for the recommended sentence of 120 months.  The defendant did more than just possess child pornography; he distributed child pornography to an undercover detective. The defendant did more than just talk about meeting up with a child; he traveled to D.C. for the purpose of engaging in sexual activity with a child.  The defendant did not actually produce child pornography, but he talked about it in detail and a camera was recovered from his car. Considering all of the facts of this case, and considering the danger posed by the defendant to minors and society in general, as well as his son in particular, the government believes that a sentence of 120 months of incarceration, followed by 120 months of supervised release, is appropriate and warranted.

   **6.**       **Restitution**

None of the identified child victims in this case have requested notification.  No restitution requests have been received.

**IV.** **CONCLUSION**

WHEREFORE, for all of the reasons set forth herein, the government recommends that the Court sentence the defendant to a term of imprisonment of 120 months, to be followed by 120 months of supervised release, with the recommended conditions of supervision.  The defendant is further required by statute to register as a sex offender for a period of 25 years.

Respectfully submitted,

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY


_____
Cassidy Kesler Pinegar
Assistant United States Attorney